1
2
3
4
5          **IN THE UNITED STATES DISTRICT COURT**

6          **FOR THE DISTRICT OF ARIZONA**

7

8    David Arenberg,                        )    No. CV 10-2228-PHX-JWS (MHB)
                                            )
9            Plaintiff,                     )    **ORDER**
                                            )
10   vs.                                    )
                                            )
11   Charles Ryan, *et al.*,                )
                                            )
12           Defendants.                    )
                                            )
13   _____   )

14          Plaintiff David Arenberg brought this civil rights action under 42 U.S.C. § 1983

15   against various officials from the Arizona Department of Corrections (ADC) for alleged

16   failure to treat his serious medical need in violation of the Eighth Amendment (Doc. 64).

17   Before the Court is Defendants' Motion for Summary Judgment (Doc. 101), which Plaintiff

18   opposes (Doc. 108).

19          The Court will grant the motion in part and deny it in part.

20   **I.     Background**

21          Plaintiff's claims arose during his confinement at the Arizona State Prison Complex

22   (ASPC)-Lewis Complex and ASPC-Florence Complex (Doc. 64).  In his First Amended

23   Complaint, he named as Defendants (1) Charles Ryan, ADC Director; (2) Jim Taylor,

24   Regional Health Administrator; (3) Dr. Richard Rowe, ADC Medical Program Manager; and

25   (4) Sandra Lawrence, former Correctional Officer (CO) IV/Grievance Coordinator (id. at 2).

26          Plaintiff alleged that in 2008, a urologist diagnosed him with an enlarged prostate and

27   advised him that he would require surgery if medication was not effective (id. at 3).  Plaintiff

28   averred that he took increasing dosages of medication for over a year, but his condition

worsened and, in October 2009, the treating ADC physician referred Plaintiff for another outside urology consultation (id.).  According to Plaintiff, despite the referral, he did not see a urologist; instead, he was told that ADC lost its contracts with outside medical providers so all outside consultations were on hold indefinitely (id.).  Plaintiff alleged that he continued to request to see a urologist, to no avail, and by October 2010, urination became so difficult that he had to use a catheter (id.).  Plaintiff stated that in November 2010, after filing this lawsuit and moving for a preliminary injunction, he was taken to a urology appointment, and in January 2011, he underwent laser surgery to correct his condition (id.).

Plaintiff alleged that Director Ryan was responsible for executing and maintaining contracts with outside medical providers and that his failure to do so from November 2009 to mid-2010 led to a denial of necessary medical care and constituted deliberate indifference to Plaintiff's serious medical needs (id. at 7).  Plaintiff sued Ryan in both his individual and official capacity (id. at 2).

Plaintiff claimed that Taylor, as the Regional Health Administrator, knew from Plaintiff's grievance appeals and medical records that Plaintiff was suffering and had been referred for an outside urology consult in October 2009, but he failed to ensure that Plaintiff saw a urologist and that failure constituted deliberate indifference (id. at 7).

Plaintiff alleged that Dr. Rowe was responsible for reviewing and prioritizing outside consultation requests and knew or should have known that Plaintiff had a serious medical need requiring an outside consultation, and Dr. Rowe's failure to schedule an appointment or ensure that Plaintiff saw a urologist amounted to deliberate indifference (id. at 8).

Finally, Plaintiff alleged that Lawrence was responsible for forwarding and tracking grievances and that she personally reviewed Plaintiff's medical grievances and appeals but failed to forward them to Taylor for six months or to Ryan at all (id.).  Plaintiff states that Lawrence's conduct, which delayed by six months or more the scheduling of an outside urology consultation, constituted deliberate indifference (id.).

Defendants move for summary judgment on the grounds that (1) Defendants did not violate Plaintiff's Eighth Amendment rights, (2) the Eleventh Amendment bars any monetary

1   claim against Defendants in their official capacity, (3) claims for declaratory and injunctive

2   relief against Defendants in their individual capacity are inappropriate, (4) Plaintiff's request

3   for punitive damages should be dismissed, and (5) Defendants are entitled to qualified

4   immunity (Doc. 101).

5   **II.   Summary Judgment Standard**

6          A court must grant summary judgment "if the movant shows that there is no genuine

7   dispute as to any material fact and the movant is entitled to judgment as a matter of law."

8   Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The

9   movant bears the initial responsibility of presenting the basis for its motion and identifying

10   those portions of the record, together with affidavits, that it believes demonstrate the absence

11   of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

12          If the movant fails to carry its initial burden of production, the nonmovant need not

13   produce anything.  Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc., 210 F.3d 1099,

14   1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden then

15   shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

16   contention is material, i.e., a fact that might affect the outcome of the suit under the

17   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury

18   could return a verdict for the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

19   248, 250 (1986); see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir.

20   1995).  The nonmovant need not establish a material issue of fact conclusively in its favor,

21   First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must

22   "come forward with specific facts showing that there is a genuine issue for trial." Matsushita

23   Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation

24   omitted); see Fed. R. Civ. P. 56(c)(1).

25          At summary judgment, the judge's function is not to weigh the evidence and

26   determine the truth but to determine whether there is a genuine issue for trial.  Anderson, 477

27   U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all

28

1   inferences in the nonmovant's favor.  Id. at 255.  The court need consider only the cited

2   materials, but it may consider any other materials in the record.  Fed. R. Civ. P. 56(c)(3).

3   **III.    Facts**

4        In support of their motion, Defendants submit a separate Statement of Facts (DSOF)

5   (Doc. 102), which is supported by Defendants' and other ADC officials' declarations, copies

6   of medical records, and excerpts from Plaintiff's deposition (id., Exs. A-P).  In opposition,

7   Plaintiff files a corresponding Controverted Statement of Facts (PCSF) and his own

8   Statement of Facts (PSOF) (Doc. 109), which are supported by his declaration (Doc. 110),

9   ADC records, and responses to interrogatories (Doc. 109, Exs. 1-6).

10       Defendants present numerous factual assertions regarding Plaintiff's medical care for

11  various ailments beyond his prostate condition, as well as factual assertions regarding

12  Plaintiff's treatment beginning in 2007.  The Court summarizes those facts that provide

13  background information about Plaintiff's prostate condition and treatment but otherwise sets

14  forth only those facts relevant to Plaintiff's claim and the period from approximately October

15  2009 to January 2011.

16       **A.    Medical Care**

17       In early 2008, after Plaintiff experienced increasingly severe problems and difficulty

18  with excessive urination, ADC physician Dr. Kanter assessed Plaintiff with prostatitis Benign

19  Prostatic Hypertrophy (BPH) and submitted an outside consult request for a urology

20  appointment for treatment options or surgery (PSOF ¶ 1; DSOF ¶¶ 24, 32).  In May 2008,

21  outside provider Dr. Kuo performed a cystoscopy to inspect the interior of the bladder; the

22  results showed that the lateral lobes of the prostate were occluded (DSOF ¶¶ 36, 43).[1]  Dr.

23  Kuo prescribed Flomax and informed Plaintiff that his other option was surgery (DSOF

24  ¶ 43).

25       For the next year, Plaintiff continued to be monitored by Dr. Kanter, who changed

26  Plaintiff's medication from Flomax to Hytrin and later to Terazosin (id. ¶¶ 44-45, 48).

27  Plaintiff's symptoms began to worsen in October 2008, and in February 2009, Plaintiff

28

---

[1]See Stedman's Medical Dictionary cystoscopy (27th ed. 2000).

1  complained that the increased dosages of medication did not seem to be working and he had

2  to get up multiple times each night to urinate (id. ¶¶ 47, 50).  In May 2009, Dr. Kanter noted

3  that Plaintiff's prostate symptoms were no longer controlled and were worsening; Dr. Kanter

4  submitted a non-formulary drug request for Flomax (id. ¶¶ 53-54).

5      On October 14, 2009, after Plaintiff complained of urination 10-12 times throughout

6  the night, Dr. Kanter submitted an outside consult request for Plaintiff to see Dr. Kuo for

7  treatment options given that various medications failed to treat Plaintiff's BPH (id. ¶ 56;

8  PSOF ¶ 7).  On October 20, 2009, the ADC Central Office received the outside consult

9  request (DSOF ¶ 57).  Defendants state that the request was approved that same day, but the

10  word "refused" is written on the form (id.; Doc. 102, Ex. C, Ex. 26 (Doc. 102-1 at 100)[2]).

11      On October 21, 2009, Plaintiff was moved from the Lewis-Stiner Unit to the Lewis-

12  Barchey Unit (DSOF ¶ 58).  On November 9, 2009, the Flomax prescription was renewed

13  (id. ¶ 59).  A few days later, on November 13, 2009, Plaintiff was transferred from the

14  Barchey Unit to the Lewis-Bachman Unit (id. ¶ 60).  In early December 2009, Plaintiff

15  reported new side effects from his medication and requested to see a doctor; Plaintiff

16  renewed this request in January 2010 (id. ¶¶ 62-63).

17      Meanwhile, on January 6, 2010, since he had not yet seen a urologist, Plaintiff filed

18  a grievance (PSOF ¶ 8).  On February 4, 2010, he received the grievance response, which

19  informed him that ADC had lost its contracts with outside medical providers but that it now

20  had a contract with a urology practice in the Phoenix area (id. ¶ 9 (in part); DSOF ¶ 115).

21  On February 10, 2010, Plaintiff filed a first-level appeal of this response (PSOF ¶ 12; DSOF

22  ¶ 116 (in part)).

23      Plaintiff also submitted a Health Needs Request (HNR), dated February 9, 2010,

24  asking that because a contract with a urologist has now been entered into, he be scheduled

25  for an appointment immediately (DSOF ¶ 65).  The response to this HNR, dated February 10,

26

27

28      [2]The second citation refers to the page number in the Court's Case Management/Electronic Case Filing system.

- 5 -

1  2010, informed Plaintiff that he was already scheduled for an appointment (id.; Doc. 102,

2  Ex . C, Ex. 31 (Doc. 102-1 at 110)).

3       In March 2010, Plaintiff was seen by ADC medical staff and, the next month, he

4  submitted an HNR asking to see a physician because his prostate problem was getting worse

5  (DSOF ¶¶ 66-67).

6       There was no response to Plaintiff's February 10, 2010 first-level appeal, so on

7  April 21, 2010, he filed a second-level appeal to Director Ryan (PSOF ¶¶ 12-13; DSOF

8  ¶ 119).

9       Defendants state that Plaintiff refused a urology follow-up in April 2010, as

10  documented on a Continuity of Care/Transfer Summary form, which was filled out by an

11  ADC nurse for preparation of Plaintiff's transfer to Kingman (id. ¶ 68; Doc. 102, Ex. C,

12  Ex. 34 (Doc. 102-1 at 116)).  Plaintiff states that he did not refuse a urology follow-up (PCSF

13  ¶ 68; PSOF ¶ 33).  On May 7, 2010, Plaintiff was moved from the Lewis-Bachman Unit to

14  the Lewis-Barchey Unit, where he remained for a few days until May 12, 2010, when he was

15  transferred to Arizona State Prison-Kingman, a private prison (DSOF ¶¶ 69-70).  The day he

16  arrived at the Kingman facility, Plaintiff submitted an HNR explaining that he had BPH; that

17  it was getting so bad that he was going to need a catheter to urinate; that he was supposed to

18  see a urologist but it had been nine months; and he asked for help (id. ¶ 71).  On May 20,

19  2010, Plaintiff was seen at the Kingman facility by Dr. Tariq, who submitted a non-formulary

20  medication request for Flomax (id. ¶ 72).

21       Less than three weeks later, on June 1, 2010, Plaintiff was returned to the Lewis-

22  Bachman Unit (id. ¶ 74).  The next day, Plaintiff submitted an HNR stating that he has been

23  waiting for a urologist appointment since August 2009; that the Kingman doctor told him his

24  condition was too serious for them to handle; that his BPH medication had been

25  discontinued; and that the problem had become so bad he is going to need a catheter (id.

26  ¶ 76).  On June 8, 2010, Plaintiff was seen by a nurse; Plaintiff reported that he felt better

27  after taking his medication for a few days and he was not making as many trips to the

28  bathroom (id. ¶ 77).

1    On June 28, 2010, Plaintiff was moved to the Florence Picacho Unit, and the next day

2  he submitted an HNR stating that he has BPH; that he was suppose to see a urologist the

3  previous year but has not seen one yet; that he urinates 6-10 times per night; and to please

4  schedule a urology consult (id. ¶ 79; PSOF ¶ 23[3]).

5    On July 12, 2010, Plaintiff was seen by ADC physician Dr. Steinhauser, who

6  submitted an outside consult request for Plaintiff to see a urologist (DSOF ¶ 80 (in part)).

7  The request noted that Plaintiff may need a transurethral resection of the prostate and that

8  medications have failed, and there is a note added that Plaintiff "states he will not refuse

9  urology appt as he did 10/09" (id.). Plaintiff denies making the statement attributed to him

10  and avows that he never refused urology treatment (PCSF ¶ 80; PSOF ¶ 33[4]).

11    On July 19, 2010, Plaintiff submitted another HNR stating that he urinates 8-12 times

12  per night, that he has been waiting to see a urologist since August 2009, and that he has been

13  moved to 6 different yards since then (DSOF ¶ 82). The response to this HNR informed

14  Plaintiff that the urology appointment request was refused in October 2009, and a request

15  was reissued on July 12, 2010 (id.).

16    Around this time, Taylor received Plaintiff's second-level appeal that was addressed

17  to Director Ryan and submitted back on April 21, 2010 (id. ¶ 119). Taylor's response, dated

18  August 10, 2010, informed Plaintiff that his medical file was reviewed and that Plaintiff was

19  scheduled for a urology consult that will take place within 30 days (id. ¶ 125).[5]

20    On August 11, 2010, Plaintiff was moved to the Florence North Unit (DSOF ¶ 83).

21  On September 2, 2010, he submitted an HNR stating that he was scheduled for an outside

22  medical appointment a few weeks before—which he assumed was a urology consult—but

23

24    [3]Defendants' objection to PSOF ¶ 23 is overruled (Doc. 116 at 4). Defendants present
25  the same factual assertion in DSOF ¶¶ 78-79.

26    [4]Defendants' objection to PSOF ¶ 33 is overruled (Doc. 116 at 5). PSOF ¶ 33 is
27  properly supported by Plaintiff's declaration, and Plaintiff has personal knowledge to testify
   to this fact. Fed. R. Civ. P. 56(c)(4).

28    [5]Defendants note that the response states only that a review of Plaintiff's medical file
   was conducted, not that Taylor reviewed the file (Doc. 116 at 4).

it was cancelled, and that his prostate problem was very severe so he asked to be rescheduled (id. ¶ 85).  This HNR was forwarded to the clinical coordinator (id.).

On September 14, 2010, Plaintiff filed a grievance appeal to Ryan, appealing the August 10, 2010 response from Taylor (id. ¶ 126).  In this appeal, Plaintiff noted that Taylor had advised that a urology consult would take place within 30 days but that time has elapsed and Plaintiff has not yet seen a urologist (Doc. 102, Ex. B, Ex. 4 (Doc. 102-1 at 28)).

Plaintiff filed two HNRs on September 23, 2010, stating that he had severe BPH; he was told a urology appointment was scheduled but he has not been seen and has been waiting for this appointment since July 2009; his problem is worsening and his sleep and mental health are affected; and to please schedule the appointment at once (id. ¶¶ 86-87).  The responses to these HNRs stated that an appointment was scheduled (id.).  On September 28, 2010, Plaintiff filed another HNR stating that the problem is so bad he can barely push out urine (id. ¶ 88).

On September 29, 2010, Plaintiff saw ADC physician Dr. Phan, who noted that a consult was pending, that Plaintiff was unable to tolerate a urine catheter, and he prescribed Oxybutynin to reduce muscle spasms of the bladder and urinary tract (id. ¶ 89).

On October 10, 2010, Plaintiff submitted an HNR stating that the Oxybutynin is not working and urination has become very difficult so he would like to get catheters (id. ¶ 90).

On October 12, 2010, Plaintiff filed this civil-rights action and a motion for a preliminary injunction to obtain medical care from a urologist (PSOF ¶ 27).

Defendants state that on October 14, 2010, Plaintiff refused a nursing assessment on the basis that it was not needed, and on November 3, 2010, he refused a lab appointment because he was not taking medications as prescribed (DSOF ¶¶ 91-92).  Plaintiff confirms that he refused the nursing assessment and lab appointment but states that these refusals were unrelated to his prostate condition (PCSF ¶¶ 91-92).

On November 16, 2010, a response to Plaintiff's grievance appeal was issued by Deputy Director Charles Flanagan on behalf of Ryan; the response informed Plaintiff that he was scheduled for a urology consult in late November 2010 (DSOF ¶ 126).

1    On November 17, 2010, Plaintiff had an outside consultation with Dr. Kau, who stated

2    that Plaintiff was a candidate for a laser resection procedure (id. ¶ 93).  On November 23,

3    2010, Dr. Phan submitted an outside consult request for the procedure; that request was re-

4    faxed on December 17, 2010 (id. ¶ 95).

5        Before re-faxing the request, Dr. Phan saw Plaintiff on December 14, 2010 (DSOF

6    ¶ 96).  In his medical notes, Dr. Phan opined that Plaintiff had delayed his own BPH

7    treatment, and he noted Plaintiff's multiple transfers and confusion as to what appointments

8    have been refused (id.).  Plaintiff denies the veracity of those statements suggesting that

9    Plaintiff refused urology consults or delayed his own treatment (PCSF ¶ 96).

10       Plaintiff underwent the laser procedure on January 25, 2011 at Scottsdale Healthcare

11   Shea, and he had a follow-up appointment with Dr. Kau on February 2, 2011 (id. ¶¶ 97, 100).

12   After some post-surgical urine-frequency problems, Plaintiff's symptoms cleared up, and he

13   has not complained of any prostate problems since March 2011 (id. ¶¶ 98-99, 101-104).

14   **B.    Arizona Revised Statute § 41-1608**

15       Part of Defendants' argument for summary judgment relates to a state law passed in

16   2009 that reduced reimbursement rates paid to ADC outside medical contractors.  The

17   following facts relate to that statute:

18       Under state law, the ADC Director must provide medical and health services for

19   prisoners and may contract for services to carry out this responsibility (id. ¶ 4).  See Ariz.

20   Rev. Stat. § 31-201.01(D).  Arizona House Bill 2010 proposed to amend Arizona Revised

21   Statute § 41-1608 to require that any reimbursement for inmate medical services by a

22   contracted medical provider not exceed the capped fee-for-service schedule adopted by the

23   Arizona Health Care Costs Containment System (AHCCCS) (DSOF ¶ 13).  During the 2009

24   legislative session, Ryan became aware that the medical reimbursement rate could change,

25   and ADC began contacting contractors to try to negotiate a new reimbursement rate to renew

26   contracts (id. ¶ 14).  On November 24, 2009, § 41-1608 became effective and prohibited

27   ADC from paying above 100% of the AHCCCS rate to outside medical providers (id. ¶ 15).

28

1    In November 2009, the two contracted outside medical-service venders cancelled their
2    service contracts with ADC because they refused to accept AHCCCS rates (id. ¶ 17).

3    Also in November 2009, the ADC procurement office issued a request for bids for
4    services, but just one provider submitted a bid, which was denied for failure to meet
5    mandatory requirements (id. ¶ 19).

6    Defendants state that in December 2009, on an emergency basis, ADC entered into
7    direct contracts for limited hospital and outpatient speciality services on a case-by-case basis
8    (id. ¶¶ 20-21).  The Medical Review Board at each ADC Complex was advised to review,
9    re-triage, and prioritize on a weekly basis all pending outside consult requests, with those
10   consults of higher acuity given higher priority (id. ¶ 24).  The Medical Program Manager
11   would then review and evaluate the outstanding consultation requests and approve or revise
12   the recommended prioritizations (id. ¶ 21).  Defendants state that in early January 2010, ADC
13   facilities received a list of speciality providers who would see ADC inmates at AHCCCS
14   rates (id. ¶ 22).

15   Defendants state that the November 2009 loss of the vender contracts resulted in
16   approximately a 3-month backlog in outside consultation appointments (id. ¶ 27).
17   Defendants state that new hospital contracts were established in March 2010, and in late
18   2010, the ADC entered into contracts with two new venders for inpatient and outpatient
19   inmate medical services (id. ¶¶ 23, 25).

20   **III.    Eighth Amendment Liability**

21       **A.    Legal Standard**

22   Prison officials are obligated to provide medical care for inmates.  See Estelle v.
23   Gamble, 429 U.S. 97, 103 (1976).  To maintain an Eighth Amendment medical-care claim,
24   a prisoner must demonstrate "deliberate indifference to serious medical needs."  Jett v.
25   Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle, 429 U.S. at 104).  There are two
26   prongs to the deliberate-indifference analysis: an objective standard and a subjective
27   standard.  First, a  prisoner must show a "serious medical need."  Jett, 439 F.3d at 1096
28   (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's

- 10 -

1   condition could result in further significant injury or the 'unnecessary and wanton infliction

2   of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other

3   grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc)

4   (internal citation omitted).

5        Second, a prisoner must show that the defendant's response to that need was

6   deliberately indifferent. Jett, 439 F.3d at 1096. The state of mind required for deliberate

7   indifference is subjective recklessness; however, "the standard is 'less stringent in cases

8   involving a prisoner's medical needs . . . because the State's responsibility to provide inmates

9   with medical care ordinarily does not conflict with competing administrative concerns.'"

10  Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012) (quoting McGuckin, 974 F.2d at

11  1060). The deliberate-indifference prong is met if the prisoner demonstrates (1) a purposeful

12  act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference.

13  Id.

14       Prison officials are deliberately indifferent to a prisoner's serious medical needs if

15  they deny, delay, or intentionally interfere with medical treatment. Wood v. Housewright,

16  900 F.2d 1332, 1334 (9th Cir. 1990). But a delay in providing medical treatment does not

17  constitute an Eighth Amendment violation unless the delay was harmful. Hunt v. Dental

18  Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (citing Shapley v. Nevada Bd. of State Prison

19  Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)). And a difference of opinion as

20  to which medically acceptable course of treatment should be followed does not amount to

21  deliberate indifference. See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989).

22       Defendants concede that Plaintiff has demonstrated a serious medical need and

23  thereby satisfied the objective prong of the deliberate-indifference analysis (Doc. 116 at 7).

24  Thus, the analysis rests on the subjective prong—whether Defendants' response to Plaintiff's

25  serious medical need was deliberately indifferent. For clarity, the Court addresses the

26  liability of each Defendant in turn.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    **B.**    **Ryan**

        *1. Defendants' Motion*

        Defendants argue that there are no facts to show that Ryan acted with deliberate indifference to Plaintiff's medical needs (Doc. 101 at 14).  They state that Ryan does not have direct involvement with inmate medical care and is not a licensed medical professional, nor does he create medical policy (id.).  Defendants maintain that Ryan's only contact with Plaintiff was the inmate grievance appeal addressed to Ryan, which was responded to by Charles Flanagan on Ryan's behalf (id. at 16).  According to Defendants, denying Plaintiff's appeal is insufficient to support liability for a constitutional violation (id. at 17).

        Defendants assert that Ryan was not involved in the procurement of medical contracts after the passage of House Bill 2010, nor did he have any control over the passage of the state statute that affected reimbursement rates (id. at 14, 17).  Defendants submit that Plaintiff sues Ryan solely because he is the ADC Director and not because of his personal actions or inactions and that because there is no respondeat superior liability under § 1983, Plaintiff's claim fails (id.).

        Lastly, Defendants argue that Plaintiff's monetary claim against Ryan in his official capacity is barred by the Eleventh Amendment and that Plaintiff's claims for declaratory and injunctive relief cannot be brought against Ryan or any Defendant in their individual capacity (id. at 21-22).

        *2. Plaintiff's Response*[6]

        Plaintiff notes that his claim against Ryan does not concern direct medical care; rather, he alleges that Ryan's liability stems from Ryan's personal involvement in the execution and maintenance of contracts with outside medical providers (Doc. 108 at 5).  Plaintiff argues that a supervisor can be liable if he knows that the prison is utilizing unconstitutional procedures and fails to correct them, and he argues that Ryan had the statutory responsibility

---

    [6]The Court issued a Notice, required under Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998), informing Plaintiff of the requirements under Federal Rule of Civil Procedure 56 (Doc. 107).

to provide medical care to prisoners and he was therefore liable for the failure to provide adequate care (id. at 6-7).  In support, Plaintiff cites to the decision in Starr v. Baca, 652 F.3d 1202 (9th Cir. 2011), which held that the defendant sheriff was liable for alleged unconstitutional conditions of confinement upon a showing that the sheriff knew about the conditions and failed to act (id. at 6-7).  Plaintiff also to cites to various out-of-circuit decisions holding that supervisory liability extends to medical-care cases (id. at 7, citing cases).  Plaintiff notes that there is an established right to medical care for inmates and a statutory responsibility assigned to Ryan to provide adequate medical care to prisoners in his custody, which, Plaintiff argues, makes it Ryan's personal responsibility (id. at 7, 9).

Plaintiff disputes Ryan's claim that any delays in medical care caused by House Bill 2010 were beyond Ryan's control, and Plaintiff cites cases holding that prison officials may not deny medical care for non-medical reasons like inadequate staffing or costs (id. at 7-8, citing cases).  Plaintiff points to Ryan's own statement that he was aware of the pending medical reimbursement rate change proposed in House Bill 2010 and therefore initiated negotiations in November 2009 to obtain new contracts (id. at 8).  Plaintiff notes that House Bill 2010 passed the House in July 2009 but did not go into effect until November 2009; thus, Plaintiff contends that Ryan had four months to try to initiate contracts but did not make any efforts until November 2009 (id. at 8-9).

Plaintiff also challenges Ryan's claim that he is not involved in inmate health care. Plaintiff proffers the copy of a November 6, 2009 letter from Ryan to ADC medical staff in response to staff letters complaining about numerous problems with health care delivery at ADC facilities (id. at 10; Doc. 109, Ex. 4 (Doc. 109 at 16-19)).  Plaintiff argues that this letter—in which Ryan states that he is aware of the concerns felt by medical staff and that he has taken certain actions to address those concerns—creates a material factual dispute as to whether Ryan was aware of prison medical issues and had the capacity to ensure the administration of proper medical treatment to inmates (id.).

1

### 3. Defendants' Reply

2        In response to Plaintiff's allegation that Ryan failed to timely respond to the

3   impending rate change proposed by House Bill 2010, Defendants argue that after Ryan

4   became aware that the rate could change, and before House Bill 2010 passed on September

5   3, 2009, ADC was in contact with its current contractors (Doc. 116 at 7). They argue that

6   it was not clear that ADC would have to acquire new contractors until November 2009, when

7   the current contractors actually cancelled their services (id. at 7-8).

8        Defendants contend that this situation is not like that in Starr v. Baca, on which

9   Plaintiff relies (id. at 9). They assert that in Starr, there were detailed factual allegations of

10  specific incidents where the sheriff was put on notice of inmate deaths and injuries and he

11  was alleged to have acquiesced in the unconstitutional conduct (id.). Defendants maintain

12  that Plaintiff's First Amended Complaint is devoid of any factual allegations that are

13  comparable to those in Starr or that relate to supervisory liability (id.).

14       Defendants next argue that the November 6, 2009 letter Plaintiff proffers to show that

15  Ryan is involved in medical care is not applicable to this case because this case concerns

16  outside consultations; specifically, Plaintiff's request for a urology consult (id. at 9-10).

17  They contend that nothing in the letter indicates that Ryan directed inmate medical care or

18  was involved in the procurement of medical contracts after the passage of House Bill 2010

19  (id. at 10).

20       Finally, Defendants argue that Plaintiff fails to submit any evidence that any delay in

21  treatment caused him harm (id.).

22

### 4. Analysis

23

#### a. Official-Capacity Liability

24       An "official-capacity suit is, in all respects other than name, to be treated as a suit

25  against the entity," which is the real party in interest. Kentucky v. Graham, 473 U.S. 159,

26  166 (1985). The Eleventh Amendment bars suits for money damages against a state or state

27  officials acting in their official capacity. Will v Mich. Dep't of State Police, 491 U.S. 58, 71

28  n. 10 (1989); Pena v. Gardner, 976 F.2d 469, 472 (9th Cir. 1992). It does not, however, bar

1   suits seeking injunctive relief or certain declaratory relief against state officers in their

2   official capacity.  See Rounds v. Or. State Bd. of Higher Educ., 166 F.3d 1032, 1036 (9th

3   Cir. 1992).  With a claim for declaratory relief, the court must determine what type of

4   declaratory relief is at issue: retrospective declaratory relief would declare that the defendant

5   committed constitutional violations in the past; prospective relief would declare that likely

6   future actions are unconstitutional.  See Nat'l Audubon Society, Inc. v. Davis, 307 F.3d 835,

7   847-48 & n. 5 (9th Cir. 2002).  The Eleventh Amendment bars only claims for retrospective

8   declaratory relief.  See Green v. Mansour, 474 U.S. 64, 71-73 (1985) (Eleventh Amendment

9   barred retrospective declaratory relief against state officials); Porter v. Jones, 319 F.3d 483,

10  491 (9th Cir. 2003) ("suits against an official for prospective relief are generally cognizable,

11  whereas claims for retrospective relief (such as damages) are not").

12          In his First Amended Complaint, Plaintiff dropped his request for injunctive relief but

13  requested a declaratory judgment "that defendants' acts and omissions described herein

14  violated plaintiff's rights under the Eighth Amendment" (Doc. 64 at 9).  Thus, Plaintiff seeks

15  a declaration that Ryan violated his constitutional rights in 2009-2010 when he allegedly

16  failed to maintain contracts with outside providers, which resulted in a delay/denial of

17  medical care.  Plaintiff has since received the proper specialist care, and ADC now has

18  contracts with outside medical providers.  Plaintiff does not allege a continuing violation or

19  that a violation based on the absence of outside contracts is likely to reoccur.  Consequently,

20  the declaratory relief sought by Plaintiff is retrospective in nature and it is barred by the

21  Eleventh Amendment.

22          Summary judgment will therefore be granted as to the official-capacity claim against

23  Ryan.

24                          ***b.  Individual-Capacity Liability***

25          There is no bar to actions for money damages against state officials in their personal

26  capacity.  See Hafer v. Melo, 502 U.S. 21, 30-31 (1991). Although there is no respondeat

27  superior liability under § 1983, Ashcroft v. Iqbal, 556 U.S. 662, 675-76 (2009), a supervisor

28  may be liable in his individual capacity for deliberate indifference "if there exists either his

- 15 -

"personal involvement in the constitutional deprivation" or "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." <u>Starr</u>, 652 F.3d at 1206-7 ("[a] showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor").  The supervisor need not be "physically present when the injury occurred" nor "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." <u>Id.</u> at 1205 (quotation omitted).  The supervisor's participation may include his "own culpable action or inaction in the training, supervision, or control of his subordinates, his acquiescence in the constitutional deprivations of which the complaint is made, or conduct that showed a reckless or callous indifference to the rights of others."  <u>Id.</u> at 1205-06 (internal citations and quotation marks omitted); <u>see</u> <u>Williams v. County of San Mateo</u>, 2012 WL 2513962, at *1 (9th Cir. July 2, 2012) (unpublished) (material factual dispute as to the defendant sheriff's supervisory liability because jury could find that the sheriff was aware of the polices and practices concerning detention of inmates and the evidence suggests that the sheriff, "as the person 'required by statute to take charge of and keep the county jail and the prisoners in it,' acquiesced in the unconstitutional conduct of his subordinates").

The inquiry into causation "must be individualized" and focus on the duties and responsibilities of the individual defendant whose acts or omissions are alleged to have caused a violation.  <u>Leer v. Murphy</u>, 844 F.2d 628, 633-34 (9th Cir.1988).  The focus is on "whether the individual defendant was in a position to take steps to avert the [incident], but failed to do so intentionally or with deliberate indifference." <u>Id.</u> at 634.

In analyzing the claim against Ryan, the Court first rejects Defendants' contention that Plaintiff failed to plead detailed factual allegations in his First Amended Complaint like the plaintiff in <u>Starr</u> and, thus, Plaintiff cannot support his claim against Ryan (Doc. 116 at 9). The Court already determined at screening that Plaintiff's factual allegations were sufficient to support an individual-capacity claim against Ryan.

1    Whether Ryan had the requisite knowledge of a substantial risk of harm may be shown

2    by inference from circumstantial evidence or from the fact that the risk was obvious. Farmer

3    v. Brennan, 511 U.S. 825, 842 (1994); see Lolli v. County of Orange, 351 F.3d 410, 421 (9th

4    Cir. 2003) ("like recklessness in criminal law, deliberate indifference to medical needs may

5    be shown by circumstantial evidence when the facts are sufficient to demonstrate that a

6    defendant actually knew of a risk of harm").  The risk of harm to inmates if contracts were

7    not renewed and no outside speciality care was available was obvious. See Farmer, 511 U.S.

8    at 842.  Beyond that obvious risk, Defendants' own evidence shows that, during the 2009

9    legislative session, Ryan was aware of the impending reimbursement rate change and need

10   for negotiations with venders to ensure contract renewals and that he was aware of the

11   subsequent November 2009 contract cancellations (Doc. 102, Ex. A, Ryan Decl. ¶¶ 7-8, 10-

12   11 (Doc. 102-1 at 14-15)).  Also, Ryan's statements in his November 6, 2009 letter to

13   medical staff demonstrates that he was aware of the concern over cuts to reimbursement rates

14   for specialty care; he advised staff that "ADC is working behind the scenes" to establish

15   alternative plans for providing speciality services to inmates (Doc. 109, Ex. 4 (Doc. 109 at

16   18)).  Finally, Ryan avers that he received Plaintiff's September 14, 2010 grievance appeal

17   putting him on notice that Plaintiff had yet to be seen for a requested urology consultation

18   (Doc. 102, Ex. B, Ryan Decl. ¶ 18 (Doc. 102-1 at 16-17)).

19        As stated, under state law, Ryan must provide medical and health services for

20   prisoners, and, to meet this obligation, he may contract for outside services (Doc. 102, DSOF

21   ¶ 4).  Ariz. Rev. Stat. § 31-201.01(D).  Even though state law allows Ryan to delegate to

22   appropriate personnel administrative functions or duties, Ryan had a duty to ensure that those

23   to whom he delegated functions or duties performed those duties appropriately.  See Ariz.

24   Rev. Stat. § 41-1604(B)(1)(d) (the director may delegate functions or duties "that the director

25   believes can be competently, efficiently and properly performed"); Starr, 652 F.3d at 1208

26   (relying on fact that the defendant sheriff was required by state statute to take charge of

27   county jails and was answerable for prisoner's safekeeping); see also Taylor v. Mich. Dep't

28   of Corr., 69 F.3d 76, 80-81 (6th Cir. 1995) (material factual dispute whether defendant

- 17 -

warden properly discharged his duty to review and approve all transfers and ensure safety of vulnerable inmates).  Despite the statutory duty assigned to him, Ryan states that he was not involved in the procurement of medical contracts; yet, he does not indicate that he designated this duty or function to someone else (Doc. 102, Ex. B, Ryan Decl. ¶ 17).  Further, at the same time he claims no involvement, he vehemently argues that ADC did not "rest on its laurels" in trying to secure outside contractors and that attempts to negotiate services began as soon as Ryan became aware that the medical reimbursement rate could change (Doc. 116 at 7).  In his declaration, Ryan describes ADC's negotiation and procurement steps in obtaining two new contractors in late 2010 (Doc. 102, Ex. B, Ryan Decl. ¶¶ 9-16).  And in his November 6, 2009 letter, he referred to ADC's work to establish alternative plans for specialty care (Doc. 109, Ex. 4 (Doc. 109 at 18)).  On this record, there is a genuine issue of material fact whether Ryan was responsible for and involved in securing outside contracts to provide medical and health services for prisoners.

The evidence shows that ADC did not enter into new contracts for inpatient and outpatient medical services until late 2010—a year after the 2009 cancellations (Doc. 102, Ex. B, Ryan Decl. ¶ 16 (Doc. 102-1 at 16)).  Ryan avers that immediately after the November 2009 contract cancellations, ADC entered into direct contracts for speciality services on an emergency basis and, in January 2010, ADC provided its facilities a list of speciality providers willing to see inmates (id. ¶¶ 12, 14).  But Defendants do not proffer a copy of this list of providers or any of the direct contract information, and there is no explanation why Plaintiff was not seen by one of these providers.  Because he was not seen by one of these providers, Plaintiff did not receive any specialist care following the October 14, 2009 consult request until he saw Dr. Kau on November 17, 2010 (Doc. 102, DSOF ¶ 93).  The Court finds that there exists a material factual dispute whether Ryan's failure to maintain and/or timely obtain new contracts for outside medical providers caused the over one-year delay in necessary medical treatment for Plaintiff.

To the extent that Defendants contend that Ryan could not maintain contracts and meet his obligation because of action by the state legislature, they present no legal argument

1   or precedent to support this contention.  Notably, they do not respond to Plaintiff's argument

2   that correctional officials may not deny medical care for non-medical reasons (see Doc. 108

3   at 7-8).  In Jones v. Johnson, one of the cases Plaintiff cites to support his argument, the

4   Ninth Circuit reversed the lower court's dismissal of a prisoner civil-rights action and held

5   that denial of treatment due solely to budget constraints evidences deliberate indifference.

6   781 F.2d 769, 771 (9th Cir. 1986).  And in Jett, the Ninth Circuit confirmed that deliberate

7   indifference may be found where  prison officials fail to provide medical care or ignore the

8   express orders of the prisoner's physician for reasons unrelated to the medical needs of the

9   prisoner, such as due to administrative concerns.  Jett, 439 F.3d at 1097.

10          Finally, there is sufficient evidence to show that the over one-year delay in seeing a

11   urologist was harmful to Plaintiff (Doc. 102, DSOF ¶¶ 56, 62-63, 67, 71-72, 75-76, 79-80,

12   82, 85-90; Doc. 109, PSOF ¶¶ 5, 7, 26).  See McGuckin, 974 F.2d at 1062 (unnecessary

13   continued pain may constitute the harm necessary to support Eighth Amendment violation

14   from a delay in providing needed medical care).  Accordingly, the Court will deny summary

15   judgment as to the individual-capacity claim against Ryan.

16          **B.     Dr. Rowe**

17                 ***1.   Defendants' Motion***

18          Defendants explain that as Medical Program Manager, Dr. Rowe performs clinical

19   and administrative review of submitted outside consolation requests one-to-three times per

20   week, and once a consult request is approved, the request is returned to the complex clinical

21   coordinator to schedule the consult appointment (id. at 18).  Defendants submit that the

22   backlog caused by the loss of vender contracts in 2009 did not affect Plaintiff because his

23   medical needs were addressed by ADC medical staff who saw Plaintiff frequently and

24   prescribed various medications for his conditions (id.).

25          Defendants state that, with respect to § 41-1608, "any effect the legislation's passage

26   had on [Plaintiff] was caused by [Plaintiff's] own actions" (id.).   They note that the ADC

27   Central Office received and approved Dr. Kanter's request for an outside consult on

28   October 20, 2009—before § 41-1608 took effect and before the two current vender contracts

1    were cancelled, but, according to Defendants, Plaintiff refused the consult (id. at 19).

2    Defendants also rely on the Continuity of Care/Transfer Summary form dated April 29, 2010,

3    which states that Plaintiff refused a urology follow-up (id., citing DSOF ¶ 68), and on

4    Dr. Phan's medical record dated December 14, 2010, which documents that "[Plaintiff] has

5    delayed treatment and evaluation for his BPH. He has moved numerous times to different

6    yards. He refused his urology consult on April 29, 2010 at Kingman Prison per chart" (id.,

7    citing DSOF ¶ 19; Doc. 102, Ex. C, Ex. 57 (Doc. 102-1 at 166)). Lastly, Defendants assert

8    that there were instances when Plaintiff refused medical care and that ADC had no control

9    over the cancellation of the August 20, 2010 urologist appointment (Doc. 101 at 19).

10                    ***2. Plaintiff's Response***

11           Plaintiff rejects that allegation that his own actions caused delays in obtaining an

12   outside consultation; he avers that he never refused urology treatment (id. at 11). Plaintiff

13   asserts that the claim that he refused the October 2009 consult request submitted by

14   Dr. Kanter is preposterous, and he notes that there is nothing on the outside consult form to

15   suggest that Plaintiff refused the consult (id.). According to Plaintiff, the evidence belies

16   Defendants' assertion, and he proffers Dr. Rowe's response to an Interrogatory that asked

17   Dr. Rowe the meaning of the word "refused" on the October 14, 2009 consult request form;

18   Dr. Rowe responded that he did not know and it is unknown who wrote the word "refused"

19   (Doc. 109, Ex. 5, Resp. to Interrog. No. 6 (Doc. 109 at 21)).[7] Plaintiff also argues that

20   

21           [7]Defendants object to Plaintiff's Exhibit 5 on the ground that it is an incomplete
     document (Doc. 116 at 5). Plaintiff's Exhibit 5 is an excerpt from Dr. Rowe's response to
22   interrogatories and shows only Non-Uniform Interrogatories Nos. 4-6 and the responses
     thereto (Doc. 108 at 11; Doc. 109, Ex. 5 (Doc. 109 at 21)). Defendants' objection is
23   overruled. The procedural rules governing summary judgment provide that material
     submitted in response to a summary judgment motion need only be capable of being
24   presented in a form admissible at trial, and Defendants do not argue that Exhibit 5 cannot be
     presented in a form that would be admissible at trial. Fed. R. Civ. P. 56(c)(2) ("[a] party may
25   object that the material cited to support or dispute a fact cannot be presented in a form that
     would be admissible in evidence"). Nor do Defendants dispute that Exhibit 5 is what
26   Plaintiff purports it to be—Dr. Rowe's responses to interrogatories (Doc. 109, PSOF ¶ 34).
     To the extent that Plaintiff's Exhibit 5 does not strictly comply with Rule 56, the Ninth
27   Circuit has cautioned district courts to "construe liberally motions papers and pleadings filed
     by pro se inmates and . . . avoid applying summary judgment rules strictly." Thomas v.
28   Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).

1    Defendants' current claim that he refused the October 2009 consult conflicts with ADC's

2    prior explanation for why Plaintiff did not see a urologist pursuant to the October 2009

3    referral (Doc. 109 at 11-12).  Plaintiff submits Taylor's response to an Interrogatory that

4    asked Taylor to list the dates and locations of all scheduled urology appointments; Taylor's

5    list includes "October 14, 2009–Urology Consult written by Dr. Kanter.  No appointment

6    because of loss of provider in November 2009 (St. Mary's)" (id. at 12; Doc. 109, Ex. 6,

7    Taylor Resp. to Interrog. No. 6 (Doc. 109 at 23-24)).[8]  In addition, Plaintiff notes that not one

8    of the four refusal-of-care forms submitted by Defendants refers to a refusal of the October

9    2009 consult or any other urology appointment (id. at 12).

10        Plaintiff contends that, in light of this evidence, there are genuine issues of material

11   fact precluding summary judgment for Dr. Rowe (id.).

12        ### 3. Defendants' Reply

13        Defendants reply that despite Plaintiff's claim that he did not refuse the October 14,

14   2009 urology consult, it was repeatedly recognized by ADC medical staff that he refused the

15   October 2009 appointment, as well as a urology follow-up in April 2010 (Doc. 116 at 10-11).

16   Defendants argue that, nonetheless, it was the  clinical coordinator, not Dr. Rowe, who

17   scheduled the approved outside consults (id. at 11).  Defendants assert that medical staff

18   consistently responded to Plaintiff's medical needs and, at times, Plaintiff reported a decrease

19   in symptoms (id. at 11-12).  They note that Plaintiff did not dispute their factual assertion that

20   the ADC had no control over the cancellation of the August 20, 2010 appointment due to the

21   urologist having surgery (id. at 11).

22        Lastly, Defendants claim that Plaintiff fails to show evidence of harm caused by the

23   delay in seeing a urologist and he admits that his condition has now been corrected (id. at

24   12).

25

26        [8]Plaintiff's Exhibit 6 is an excerpt from Taylor's response to supplemental

27   interrogatories and shows only Non-Uniform Interrogatory Nos. 5-8 and the responses
     thereto (Doc. 108 at 11; Doc. 109, PSOF ¶ 35 & Ex. 6 (Doc. 109 at 23-24)).  Defendants'
     objection to Exhibit 6 on the ground that it is an incomplete document is overruled (Doc. 116

28   at 5).  See n. 6.

1          ### 4. *Analysis*

2                 Plaintiff's claim against Dr. Rowe is that he knew or should have known that Plaintiff

3     had a serious medical need requiring an outside consultation, and his failure to schedule an

4     appointment or ensure that Plaintiff saw a urologist amounted to deliberate indifference (<u>id.</u>

5     at 8).

6                 Although Dr. Rowe did not personally provide medical treatment to Plaintiff, he avers

7     that he was responsible for monitoring the medical care provided at ADC and for reviewing

8     all outside consult requests, and he does not deny that he was aware of Plaintiff's serious

9     medical need and the outside consult requests for Plaintiff to see a urologist (Doc. 102,

10    Ex. C, Rowe Decl. ¶¶ 2-4 (Doc. 102 at 32-33)).

11                With regard to the October 14, 2009 outside consult request, that portion of the

12    request form to be completed by the requesting physician is filled out, signed, and dated (<u>id.</u>,

13    Ex. C, Ex. 26 (Doc. 102-1 at 100)).  The only other portions of the form completed are the

14    section documenting that the form was sent to Central Office on October 20, 2009, and the

15    section labeled "Central Office Approval," under which an unidentified individual hand

16    wrote "refused" (<u>id.</u>).  Notably, the box to be checked to document Central Office approval

17    is blank, as is the section to document approval by the "designee" or "provider" (<u>id.</u>).  Nor

18    is there any Authorization Number written in the appropriate space on the form (<u>id.</u>).  The

19    form specially states that "No appointments are to be scheduled without Authorization

20    Number" (<u>id.</u>).  In short, the face of the October 14, 2009 outside consult request form does

21    not support the conclusion that the request was ever approved.  Defendants do not cite any

22    other documentary evidence to show that the October 14, 2009 consult request was approved.

23                Although he avers that he reviews all submitted outside consultation requests,

24    Dr. Rowe does not specifically declare that *he* approved the October 2009 request (<u>id.</u>, DSOF

25    ¶ 57; <u>see</u> Doc. 102, Ex. C, Rowe Decl. ¶ 33 (Doc. 102-1 at 38)).  But even assuming that

26    Dr. Rowe approved the request, he does not explain why he failed to provide an

27    Authorization Number that is required for an appointment to be scheduled by the clinical

28    coordinator (<u>see</u> <u>id.</u>, Ex. C, Rowe Decl. ¶ 3 (Doc. 102-1 at 33)).

1    Finally, there is a material question of fact whether Plaintiff subsequently refused the

2    consult, as Defendants claim. Defendants' evidence includes some inmate-refusal forms,

3    which are used to document when an inmate refuses medical treatment (Doc. 102, Ex. C,

4    Exs. 52-53 (Doc. 102-1 at 154-157)), but there are no such forms documenting a refusal by

5    Plaintiff in or around October 2009.  The evidence also supports that Defendants do not

6    know who wrote the word "refused" on the October 2009 consult form or what it meant

7    (Doc. 109, Ex. 5 (Doc. 109 at 21)).  And the word "refused" is written in that section of the

8    form to document whether there is Central Office approval (Doc. 102, Ex. C, Ex. 26

9    (Doc. 102-1 at 100)).  Most importantly, Plaintiff avers that he never refused a urology

10   consult or urology treatment (id., PCSF ¶ 52, PSOF ¶ 33; Doc. 110, Pl. Decl. ¶ 20).

11       The Court also finds that Plaintiff has sufficiently raised a material disputed fact as

12   to whether he refused a urology follow-up on April 29, 2010 at the Kingman facility (see

13   Doc. 109, PCSF ¶ 68, PSOF ¶ 33), and, further, there is no evidence that this "follow-up"

14   was with a urologist pursuant to an outside urology consult.

15       Like the October 2009 consult request form, the July 12, 2010 consult request form

16   is incomplete (Doc. 102, DSOF ¶ 80, Ex. C, Ex. 44 (Doc. 102-1 at 139)). The section to be

17   completed by the referring physician—Dr. Steinhauser—is filled out, signed, and dated (id.).

18   But that portion of the form to indicate whether and when the form was sent to the Central

19   Office is blank, as is the space for approval by designee or provider, and there is no

20   Authorization Number (id.).  Dr. Rowe does not aver that he approved this July 2010 consult

21   request, and there is no indication whether or when Central Office may have approved this

22   request (see id., Ex. C, Rowe Decl. ¶ 50 (Doc. 102-1 at 42)).

23       Although Defendants assert that Plaintiff was scheduled to see a urologist in August

24   2010, presumably, pursuant to the July 12 consult request, the only evidence they cite to in

25   support of this assertion is an inadmissible hearsay statement from Taylor (Doc. 101 at 19;

26   Doc. 102, DSOF ¶ 84, Ex. D, Taylor Decl. ¶ 20 (Doc. 102-2 at 6)).[9]  In his declaration,

27

28       [9]Hearsay is "a statement, other than one made by the declarant . . ., offered in evidence
to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).

Taylor states that "Upon consultation with ADC Health Services staff, I was informed that [Plaintiff] was scheduled to see a urologist on August 20, 2010. This appointment was cancelled as a result of the urologist having surgery" (Doc. 102, Ex. D, Taylor Decl. ¶ 20 (Doc. 102-2 at 6)). Inadmissible evidence may be considered on summary judgment if it is capable of presentation in a form that would be admissible at trial; however, here, the Court finds that Taylor's declaration statement does not meet Rule 56 requirements. See Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001) (at summary judgment, evidence does not have to be in a form that would be admissible at trial as long as the party satisfies the requirements of Rule 56). Specifically, Taylor does not establish personal knowledge, he does not identify who allegedly told him about the appointment, and there is no evidence in the record to support Defendants' factual assertions underlying Taylor's statement, i.e. no evidence documenting an August 20, 2010 appointment or subsequent cancellation. See Fed. R. Civ. P. 56(c)(4) (declaration used to support summary judgment motion must be made on personal knowledge). Accordingly, even absent a specific objection by Plaintiff, the Court will not consider the hearsay statement to the extent that it is proffered to show that there was an August 2010 appointment.[10] See Fed. R. Evid. 801; Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002) ("trial court can only consider admissible evidence in ruling on a motion for summary judgment"). As a result, there remains a question whether the July 12, 2010 consult request was ever approved.

Regardless, even assuming the July 12, 2010 consult request was approved and the August 2010 appointment was cancelled by the urologist, there is no explanation for why Plaintiff was not timely rescheduled.

In summary, there are genuine issues of material fact whether Dr. Rowe was aware of Plaintiff's serious medical condition and the need for specialist care and whether he failed to approve the requested specialist care or ensure that Plaintiff saw the urologist after

---

[10] As set forth below in analysis of Taylor's liability, Taylor's declaration statement may be admissible if not offered for the truth of the matter asserted. See Fed. R. Evid. 801(c) & 803.

1    approval.  See Jett, 439 F.3d at 1097-98 (where prison doctor recognized the plaintiff's need

2    to see a specialist, but the plaintiff was not taken to see the specialist for at least six months,

3    a jury could find that the doctor's failure to ensure administration of the prescribed treatment

4    was deliberate indifference).  In addition, as mentioned above, there is sufficient evidence

5    from which a jury could find that the over-one-year delay in seeing a urologist caused

6    Plaintiff further harm and suffering.  Summary judgment will therefore be denied as to the

7    claim against Dr. Rowe.

8        **C.    Taylor**

9            ***1. Defendants' Motion***

10           Defendants state that Taylor is not involved in the process of initiating and approving

11   outside consult requests (Doc. 101 at 19-20).  They argue that Taylor's only contact with

12   Plaintiff was through the inmate grievance process and this is insufficient to establish

13   liability (id. at 20, citing Shehee v. Luttrell, 199 F.3d 295, 300 (6th Cir. 1999)).  Defendants

14   contend that the any delays in the grievance process did not affect Plaintiff's outside urology

15   consultations; rather, those consultations were delayed by Plaintiff's own actions (id.).

16   Defendants repeat that Plaintiff refused the approved October 2009 consult and the

17   August 20, 2010 consult appointment was cancelled by the urologist (id.).

18           ***2. Plaintiff's Response***

19           Plaintiff asserts that, contrary to Defendants' interpretation, his claim against Taylor

20   is not simply an alleged failure to respond to a grievance appeal (Doc. 108 at 13).  Plaintiff

21   explains that, as the Court set forth in its Order reinstating Taylor as a Defendant, his claim

22   is that Taylor was responsible for arranging outside medical consultations; he knew that

23   Plaintiff had a serious medical need and had been referred to a urologist; but he failed to

24   ensure that Plaintiff saw a urologist (id. at 13-14).  Plaintiff maintains that there is a genuine

25   issue material fact whether Taylor exhibited deliberate indifference to his serious medical

26   need (id. at 14).

27

28

### 3. *Defendants' Reply*

Defendants reargue that Taylor is not involved in the process of initiating and approving outside consult requests and his only contact with Plaintiff was through the inmate grievance process (Doc. 116 at 13). They maintain that denial of grievance does not establish liability (id.). Defendants note that in the previous Order on which Plaintiff relies, the Court found that Plaintiff's allegations were sufficient to state a claim against Taylor; however, on summary judgment, Plaintiff must go beyond his allegations and present evidence to show that Taylor's actions caused a delay in medical care (id. at 13-14). Defendants conclude that Plaintiff failed to do so and summary judgment is therefore warranted (id. at 14).

### 4. *Analysis*

The Court originally found that a claim against Taylor solely for his role in the grievance process was insufficient to state a constitutional claim (Doc. 17 at 5-6, citing Shehee, 199 F.3d at 300). But when it reinstated Taylor as a Defendant, the Court found that Plaintiff's additional allegations and evidence presented in his Motion for Preliminary Injunction supported a claim against Taylor for more than just his role in the grievance process (Doc. 17 at 10).

Plaintiff's claim against Taylor is that Taylor knew that Plaintiff had a serious medical need and that, in October 2009, Dr. Kanter had made a request for a urology consult; yet, Taylor failed to ensure that Plaintiff received the outside consultation (Doc. 64 at 7). In his preliminary injunction motion, Plaintiff specifically alleged that Taylor was responsible for providing outside medical appointments (Doc. 5 at 3 & Attach., Pl. Decl. ¶ 12 (Doc. 5-1 at 3)). See Fed. R. Civ. P. 56(c)(3) (court may consider materials in the record that are not cited in summary judgment briefing). As the Court stated in its Order on the preliminary injunction motion, Defendants did not refute any of Plaintiff's allegations or evidence, and, "[n]otably, the response does not dispute that Plaintiff suffered a serious medical need or that Taylor, was in fact, personally responsible for ensuring that Plaintiff received an urology consultation" (Doc. 17 at 9-10).

1    Defendants' summary judgment evidence demonstrates that Taylor is not involved "in

2  the process of initiating and approving outside consult requests" (Doc. 102, Ex. D, Taylor

3  Decl. ¶ 18 (Doc. 102-2 at 5)).  Taylor also avers that he does not provide medical care, create

4  medical policy, prescribe treatment, or log-in inmate grievance appeals that are received at

5  the Central Office (id., Ex. C, Rowe Decl. ¶¶ 3, 16, 18).  But Defendants present no evidence

6  or argument refuting that Taylor was responsible for providing outside medical appointments

7  after an outside consult request was approved, nor do they refute that Taylor was responsible

8  for ensuring that Plaintiff received the approved urology consultation.[11]

9    Taylor avers that he received Plaintiff's April 21, 2010 grievance appeal in late July

10  or early August 2010 (id. ¶ 11 (Doc. 102-2 at 4)).  This evidence supports the inference that

11  Taylor was aware that Plaintiff had a serious medical need and that he had not yet received

12  necessary outside medical treatment.  Taylor's August 10, 2010 grievance appeal response

13  states that he learned, from consultation with the clinical coordinator, that Plaintiff was

14  scheduled for a urology consult (id., Ex. 4 (Doc. 102-2 at 31)).  According to Taylor's

15  declaration, at some point after he responded to the grievance appeal, he consulted with the

16  ADC health services staff and was told that Plaintiff was scheduled to see a urologist on

17  August 20, 2010, but that appointment was cancelled (id. ¶ 20 (Doc. 102-2 at 6)).[12]  There

18  is no indication of what action, if any, Taylor took upon learning that the appointment was

19  cancelled.  And, of course, Plaintiff did not see the urologist until November 17, 2010—after

---

[11]The Court notes that in their objection to PSOF ¶ 24 on the ground that Plaintiff mischaracterizes the statements in Taylor's declaration, Defendants state that Taylor's declaration "does not indicate that he is responsible for scheduling consultations" (Doc. 116 at 4).  But Taylor does not deny that he is involved in scheduling consultations, nor does he deny that he is responsible for ensuring that those appointments are made—even though he identifies many other things for which he is *not* responsible (see Doc. 102, Ex. D, Taylor Decl. ¶¶ 3, 16, 18 (Doc. 102-2 at 2, 5-6)).

[12]The Court will not consider Taylor's statement for the truth of the matter asserted, i.e., that an appointment was scheduled for August 20, 2010, and then cancelled.  See Fed. R. Evid. 801(c). But the statement will be considered for the purpose of showing Taylor's impression of what he perceived at the time—that based on what he was told, he thought an appointment had been made and then cancelled.  See Fed. R. Evid. 803(1).

1   he filed another grievance appeal to the Director and initiated this lawsuit (see Doc. 102,

2   DSOF ¶ 93).

3          With respect to Defendants' claims that Plaintiff refused urology consults and delayed

4   his own treatment, Plaintiff proffers evidence, discussed above, which the Court must take

5   as true—namely, that he never refused a urology consult or treatment.  See Anderson, 477

6   U.S. at 255.

7          In short, given Defendants' failure to directly respond to or to submit evidence

8   refuting Plaintiff's specific allegations against Taylor, they fail to demonstrate the absence

9   of a material fact regarding (1) whether Taylor was responsible for providing outside medical

10  appointments or for ensuring that Plaintiff received a urology consult and (2) whether Taylor

11  failed to take any action upon learning that Plaintiff was not seen by a urologist in August

12  2010.  See Nissan, 210 F.3d at 1103 (if movant fails to meet initial burden, the nonmovant

13  has no obligation to produce anything).  In light of evidence that Taylor knew of Plaintiff's

14  condition and the need for a specialist, a jury could find that Taylor acted or failed to act with

15  deliberate indifference to Plaintiff's serious medical need.  Summary judgment as to the

16  claim against Taylor will be denied.

17          **D.    Lawrence**

18                  ***1.  Defendants' Motion***

19          According to Defendants, Lawrence properly handled the grievance paperwork that

20  she received from Plaintiff (id.).  They state that Lawrence received Plaintiff's January 6,

21  2010 inmate grievance that complained about excessive night-time urination and requested

22  to see a urologist, and she advised Plaintiff two days later that his grievance was forwarded

23  to medical for a response (id. at 21).  Defendants further state that after Plaintiff received the

24  response from medical, he submitted a grievance appeal, dated February 16, 2010 (id.).

25  According to Defendants, on February 22, 2010, Lawrence forwarded the grievance appeal

26  to Taylor for a response (id.).

27          Defendants assert that in April 2010, Lawrence was promoted to a different position

28  and was no longer involved in processing Plaintiff's grievances (id.).  Defendants maintain

- 28 -

that these facts do not support that Lawrence's conduct delayed medical care for Plaintiff (id.).

### 2. *Plaintiff's Response*

Plaintiff contends that, despite the claim that Lawrence forwarded his grievance appeal on February 22, 2010, the grievance log does not reflect that his grievance appeal was logged in (Doc. 108 at 12-13). In support, Plaintiff states that the grievance appeal log includes the date "2/4/10," but that date is crossed out and the date "24/29/10" is written next to it (id. at 13). Plaintiff maintains that this evidence contradicts Lawrence's claim that she forwarded the appeal on February 22 (id.). Plaintiff concludes that this issue is important because he relied on the grievance system to notify officials that he had not received a urology consultation, and Lawrence's failure to forward the appeal caused the delay in care and constituted deliberate indifference (id.).

### 3. *Defendants' Reply*

Defendants repeat their argument for summary judgment on the claim against Lawrence and argue that Plaintiff failed to present any evidence that Lawrence's actions caused him harm (Doc. 116 at 12-13).

### 4. *Analysis*

Although Plaintiff cites to the grievance log attached as Exhibit 4 to Lawrence's declaration, the Court finds that Exhibit 4 is not a copy of the grievance log but, instead, is a copy of the February 4, 2010 response to his inmate grievance (Doc. 102, Ex. E, Ex. 4 (Doc. 102-2 at 62)). Even so, according to the record, grievance appeals are logged in after they are forwarded to the Assistant Director for Health Services (id., Ex. E, Ex. 2, 802.06 § 1.1 (Doc. 102-2 at 57)). Therefore, the lack of any record of Plaintiff's grievance appeal in the grievance appeal log would show only that it was not received, not that it was never forwarded.

Defendants submit Plaintiff's grievance appeal, which is signed and dated by Lawrence as received and forwarded on February 22, 2010 (id., Ex. 5 (Doc. 102-2 at 64)). There is no evidence to support that Lawrence did not, in fact, forward Plaintiff's grievance

1   appeal on February 22, 2010.  Plaintiff's allegation that she must not have done so because

2   it was not received is conclusory and speculative and insufficient to defeat summary

3   judgment.  See Sloman v. Tadlock, 21 F.3d 1462, 1474 (9th Cir. 1994) ("conclusory

4   allegations, standing alone, are insufficient to prevent summary judgment"); see also

5   Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory,

6   speculative testimony in affidavits and moving papers is insufficient to raise genuine issues

7   of fact and defeat summary judgment").

8          Summary judgment will be granted on the claim against Lawrence.

9   **VII.   Punitive Damages**

10          Defendants argue that Plaintiff's punitive-damages claim should be dismissed because

11  he fails to present evidence that Defendants acted with evil motive or callous indifference

12  to his rights (Doc. 101 at 22).  See Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 17 (1991)

13  (punitive damages available under § 1983).  As explained above, however, there are genuine

14  issues of material fact regarding Ryan, Dr. Rowe, and Taylor's liability for a constitutional

15  violation.   If a jury concludes that they acted with callous or reckless indifference to

16  Plaintiff's Eight Amendment rights, it may assess punitive damages.  See Smith v. Wade, 461

17  U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion," and may

18  be awarded based on recklessness or serious indifference to or disregard of the rights of

19  others); Dang v. Cross, 422 F.3d 800, 807 (9th Cir. 2005).  Plaintiff's claim for punitive

20  damages will not be dismissed.

21  **VIII.  Qualified Immunity**

22          With respect to the remaining claims against Ryan, Dr. Rowe, and Taylor, Defendants

23  assert qualified immunity (Doc. 101 at 23).  Government officials enjoy qualified immunity

24  from civil damages unless their conduct violates "clearly established statutory or

25  constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,

26  457 U.S. 800, 818 (1982).  In deciding if qualified immunity applies, the Court must

27  determine: (1) whether the facts alleged show the defendant's conduct violated a

28  constitutional right; and (2) whether that right was clearly established at the time of the

1     violation.  Pearson v. Callahan, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address

2     either prong first depending on the circumstances in the particular case).

3         As discussed above, the Court has determined that disputed facts, viewed in the light

4     most favorable to Plaintiff, create a triable issue of fact regarding whether Ryan, Dr. Rowe,

5     and Taylor acted with deliberate indifference to Plaintiff's serious medical need.

6         The second step of the analysis requires Defendants to demonstrate that they

7     reasonably believed that their conduct did not violate clearly established constitutional law.

8     Defendants argue that it would be unclear to Defendants that their actions violated Plaintiff's

9     Eighth Amendment rights because none of them provided Plaintiff with medical care, Ryan

10    was not involved in the procurement of medical contracts, and Taylor properly responded to

11    Plaintiff's grievance appeal (Doc. 101 at 23-24).   These are the same arguments that

12    Defendants presented to try to show that they did not commit a constitutional violation.

13    Again, the Court has found that there are material factual disputes (1) whether Defendants

14    are liable for causing delays in Plaintiff's treatment even though they did not directly provide

15    medical care, (2) whether Ryan was responsible for securing outside medical contracts and

16    failed to timely do so, and (3) whether Taylor knew that Plaintiff needed to see a urologist

17    and failed to act when he learned that the urology appointment was cancelled.  Defendants

18    submit no argument to demonstrate that, if these factual disputes are resolved in Plaintiff's

19    favor, they would nonetheless enjoy qualified immunity.  Moreover, at the relevant time, the

20    law was clearly established that denial or delay of access to medical care may constitute

21    deliberate indifference.  See Estelle, 429 U.S. at 104-05; Clement v. Gomez, 298 F.3d 898,

22    906 (9th Cir. 2002).

23         The Court finds that Defendants fail to demonstrate that they are entitled to qualified

24    immunity, and summary judgment on this basis will be denied.

25    **IT IS ORDERED:**

26         (1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for

27    Summary Judgment (Doc. 101).

28

1          (2) Defendants' Motion for Summary Judgment (Doc. 101) is **granted in part** and

2    **denied in part** as follows:

3              (a) the motion is **granted** as to the claim against Ryan in his official capacity

4                and the claim against Lawrence;

5              (b) the motion is otherwise **denied**.

6          (3) Lawrence is dismissed as a Defendant.

7          (4) The remaining claims are the individual-capacity claims against Ryan, Dr. Rowe,

8    and Taylor for alleged deliberate indifference to Plaintiff's serious medical need.

9          DATED this 9th day of October 2012.

10

11                                      /s/   JOHN W. SEDWICK
                                   UNITED STATES DISTRICT JUDGE
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28